# THE NETTIE MOORE.

(District Court, D. Maryland. February 18, 1921.)

1. **Shipping** ⟜209 (1)—**Filing answer, asking limitation of liability, makes respondent party for all purposes.**
   Where the charterer of a barge in which he had undertaken to carry a cargo for libelant voluntarily filed an answer, claiming limitation of liability, and a cross-libel in a suit in rem for damage to the cargo, his dismissal without leave of his cross-libel did not have the effect of withdrawing his appearance as a respondent for all purposes of the suit.

2. **Shipping** ⟜208—**Charterer of barge held not entitled to limitation of liability.**
   The charterer of a barge, which was old and worth not to exceed $550, who contracted to carry a cargo worth $70,000 from New York to Baltimore, and personally signed the bills of lading and superintended its loading into the barge, held not entitled to a limitation of liability for damage to the cargo, resulting from the unseaworthiness of the barge for such service and the improper loading and covering of the cargo.

3. **Evidence** ⟜355(7)—**Ex parte survey found among papers of deceased surveyor not admissible in evidence.**
   A writing found among the papers of a deceased surveyor, purporting to be a survey of a vessel made at the request of one only of the parties to a suit, held not admissible in evidence.

In Admiralty. Suit by Abraham R. Looban, trading as the Merchants' Bag & Cover Company against the barge Nettie Moore and A. J. Snyder, trading as the New York, New England & Pennsylvania Lighterage Company. Decree for libelant.

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

George Forbes and Jacob J. H. Mitnick & Son, all of Baltimore, Md., for libelant.

George T. Mister, of Baltimore, Md., and Peter Baumer, of New York City, for respondents.

ROSE, District Judge. [1] Libelant had imported from the Far East some 250 bales of burlaps at a cost approximating $70,000. They were delivered in New York, and he had immediate and urgent need of them in Baltimore. As at the moment a railroad embargo prevented their shipment by rail, he arranged with respondent for their transportation on the barge Nettie Moore, an old Erie Canal boat of a deadweight capacity of about 350 tons.

The respondent had for many years been engaged in the barge and lighterage business, using for that purpose boats owned, or, as in the case of the Nettie Moore, chartered, by him. The craft in question was, so far as the cargo was concerned, an open boat, for throughout most of its length its only deck was a walkway about 2 feet wide on each side. Respondent undertook to load the cargo. He supplied no dunnage for it. In order to protect the burlaps, he hired six muchused tarpaulins for 50 cents a day apiece, as the boat was without hatch covers.

When the Nettie Moore reached Baltimore it was found that many of the bales of burlaps had been damaged by water. Libelant proceeded in rem against the barge. Up to that time he had had no opportunity to ascertain the extent of the injury done. To be on the safe side, he claimed $25,000. One Ellwood, who was both master and owner of the Nettie Moore, appeared as claimant. He objected to stipulating for the amount the libelant was seeking to recover, because the barge was worth at the most but an insignificant fraction of such sum. It was thereupon agreed that the barge and her freight of $1,450, paid in advance, were of the aggregate value of $2,000. Subsequently respondent filed a pleading in the case, which he described as an answer and cross-libel. He denied that the burlaps had been damaged on the barge, but, if they had been, he claimed for himself the benefit of the limited liability statutes. He asserted that the libelant, by demanding a grossly excessive stipulation, had unnecessarily detained the boat, in consequence of which he had not only been deprived of its use for a number of days, but had suffered special damage, as he lost thereby a profitable charter, and he asked for a decree against libelant for the amount of these losses. Subsequently the libelant filed an amended libel, in which, after reciting that respondent had appeared, claimed the benefit of the limited liability acts, and sought recovery upon his cross-libel, asked that he might be made a party respondent, and to that end that summons be served upon his proctor of record.

Two weeks later respondent filed an order in the clerk's office, dismissing his cross-libel without prejudice. As his answer, claim under the limited liability act, and cross-libel formed an integral part of the same papers, this order was in effect to amend the composite pleading by striking out so much of it as constituted a cross-libel. To

amend, leave of the court is required, and that was neither asked for nor given, nor would it have been a proper case in which to have permitted such an amendment. The respondent had of his own motion brought himself into the litigation, not only by seeking recovery against the libelant, but by praying the court to limit his personal liability. He was under no compulsion to do so, as the decree in the case as it stood would necessarily have been limited to the amount of the stipulation, which it was agreed was the value of the barge and her freight. The seeking and obtaining by libelant of the subsequent order to make him a party was unnecessary. It amounted to nothing more than a formal assent by the libelant to his coming into the case. Striking out the cross-libel would not withdraw the petition to limit the liability. The court would remain under obligation to pass upon that issue. The questions raised by the cross-libel are so intimately and even inseparably connected with those involved in the original libel that they should be here determined.

[2] Upon the merits it appears that the barge, by bills of lading signed by the respondent personally, acknowledged that the burlaps were, when received by it, in apparent good order and condition. When delivered in Baltimore, many of the bales were visibly in bad shape. It was up to the barge to explain what had happened to them. No explanation has been given or attempted. Nothing has been told of any perils of the sea encountered in the voyage through the various kills, canals, rivers, and bays traversed on its not too tempestuous route from New York to Baltimore. It follows as a matter of course that the barge at all events is liable. But as, upon any possible standard of computation, the damage done greatly exceeds the value of that craft, the question of the most practical importance is whether the respondent is entitled to limit his liability, and that depends upon whether the barge was seaworthy for the work it undertook to do, for the respondent was not only its charterer, but, as already stated, he had signed bills of lading himself, and was the individual who actually inspected it before he sailed. He was himself, and not through others, directly responsible for sending it forth in the condition in which it went.

[3] Libelant offered in evidence a writing found among the papers of the late Capt. Sanford of this city. It purports to be a survey of the barge, made at the instance of the libelant so soon as the burlaps were unloaded. Capt. Sanford was one of the best-known marine surveyors of this port, a thoroughly competent and reliable man. His testimony, if living, would be illuminating, and if in accord with what is stated in the paper offered in evidence would probably prove decisive. It so happens, however, that his survey was altogether an ex parte affair. No notice that he was to be asked to make it was given by the libelant to the master of the barge or to its owner, and no request to participate in it was ever made. Capt. Sanford was called into the matter after the dispute had arisen. I do not feel that any of the rules of law as to the declarations or entries made by deceased persons will justify the admission of his survey. I am persuaded, however, by the other testimony, that the barge was unseaworthy for the purpose

of transporting burlaps, and that the respondent was himself personally, and not through the oversight of any one else, negligent in fitting her for the voyage. As already stated, the goods were damaged on the trip from New York, and yet there is no suggestion that the barge met with any accident, whether due to the neglect of her master, the only person on board of her, or to any other cause. The injury to her cargo must therefore have resulted from some defect in her or in her fittings. The evidence leaves little room for question that the tarpaulins used to cover the cargo were old, worn, and insufficient to protect from the rain a cargo so susceptible to water damage as burlaps. Their defects alone sufficed to explain what happened, although a leaky hull and failure to use proper dunnage may have borne their part.

This barge, rather a roomy one, capable of carrying upwards of 300 tons, was bought in 1918 for $2,000, and that, too, at the very peak of the war prices for anything which would float. It was two years older at the time it undertook to carry burlaps of the value of $70,000, and was worth according to the agreement of the parties not more than $550. To undertake to carry such a cargo in such a craft was a reckless taking of chances with another's property. It remains to determine what damage was done.

Libelant claims upwards of $14,000, and offers evidence to show that he suffered to this extent. In the nature of things there must be a great deal of uncertainty as to all such calculations. Libelant is entitled to recover the difference between what the goods were worth in the condition in which they were when put upon the barge and their value in the state in which they were delivered by it. Ordinarily that may be measured by the difference in market prices between them in their sound and in their damaged condition. Even when so simplified, there remains in this case many doubtful factors. I shall not attempt to enumerate, much less to discuss, them. It will be sufficient to say that libelant has proved that he has been damaged to the extent of $9,000. Perhaps he lost more, but the evidence he has been able to offer does not satisfy me that he has.

A decree against the stipulators for $2,000, and for the balance of $7,000, with costs, against the respondent, may be sumitted for signature.